## BROWNE *v.* CARNLEY.

### Opinion delivered April 14, 1913.

HUSBAND AND WIFE—USE OF WIFE'S MONEY BY HUSBAND—CREDITORS OF
HUSBAND.—Where a wife turned over her money to her husband
and permitted him to use it as his own for his own purposes, and
he acquired property with it and enjoyed a basis of credit on the
faith of the property thus acquired, she can not, in a court of
equity, be permitted to assert ownership of the property to the
detriment of a creditor who has been deceived by the false basis
of credit.

Appeal from Bradley Chancery Court; *Zachariah
T. Wood,* Chancellor; reversed.

*S. J. Hunt, M. Danaher* and *Palmer Danaher,* for
appellant.

The presumption is that a voluntary alienation of
property by an embarrassed debtor is fraudulent as
against existing creditors. And when such alienation is
by an embarrassed debtor to his wife during the pen-
dency of a suit against him and immediately before the
suit is to be tried, the transaction is not only a badge of
fraud, but almost positive proof of it. 50 Ark. 42; 20
Cyc. 444; *Id.* 451.

Where the wife permits her husband to use her
money for years as his own and to invest it in real estate
in his own name, will not be permitted to assert owner-
ship in the property as against creditors who in good
faith have extended him credit in reliance upon his own-
ership. *Supra;* 116 Mo. 169; 37 W. Va. 396; 62 Ark. 32;
67 Ark. 105; 86 Ark. 486; 36 Ark. 525; 84 Ark. 222.

*B. L. Herring,* for appellee.

Mrs. Carnley's demand for one-third of the purchase
money for the homestead and for the timber lands sold
by her husband, as a consideration for the relinquish-
ment of her homestead and dower rights was reasonable,

and she was within her legal rights in receiving the same. 46 Ark. 542, 548; 56 Ark. 241, 244. In lending her husband money and taking his notes for same and in taking a conveyance of property from him in satisfaction of his indebtedness to her, she committed no fraud upon appellant, and the transaction is valid. 20 Cyc. 528 "B;" 124 S. W. (Tex.), 712, 714.

McCulloch, C. J. In July, 1909, G. B. Browne obtained a judgment for recovery of the sum of $1,901, in the circuit court of Cleveland County, against H. M. L. Carnley, husband of appellee, M. J. E. Carnley, said judgment being rendered on a bond executed by H. M. L. Carnley, and others, to appellant in an action instituted by the latter in the circuit court of Bradley County on January 30, 1905, against W. H. Harry for unlawful detainer of certain lands. The venue of that case was changed to Cleveland County, and the case was tried there, resulting, as before stated, in a judgment in appellant's favor. Appellant sued out an execution on said judgment and delivered the same to the sheriff of Bradley County, who proceeded to levy same on certain lands situated in that county as the property of H. M. L. Carnley. Mrs. Carnley instituted this action in the chancery court of Bradley County against appellant to restrain him from causing said lands to be sold under the execution. In her original complaint she alleged, in substance, that her husband, H. M. L. Carnley, bought the lands in controversy with her money and she asked that he be declared a trustee holding the legal title for her benefit. In an amended complaint filed later she alleged that her husband was indebted to her in the sum of $4,451.60 for borrowed money and conveyed said lands to her on June 25, 1909, in satisfaction of said debt. Appellant filed an answer to the original and amended complaints, denying the allegations of each and alleging that said conveyance was executed by H. M. L. Carnley to his wife with fraudulent intent to cheat, hinder and delay appellant in enforcing liability on said bond.

Mrs. Carnley testified at length as to the transac-

tions with her husband concerning the acquisition and sale of property and division of proceeds. She stated that the first property she owned was forty acres of land which she had purchased for the sum of $15, and afterward sold for the sum of $428.40, the money being paid over to her. She states further that her husband had title to 480 acres of timber land in which she claimed a third interest on account of having worked in acquiring it. Half of the land was sold for the sum of $2,521.60, and she claimed one-third of that sum and testified that it was paid over to her when the sale was made. Then she says she was to receive, and did receive, one-third of the price of the homestead, the title being in her husband's name. That sum was $1,500. She also stated that she and her husband had $5,000 in cash, and that one-third of that belonged to her. This was prior to the year 1904, during which year they moved to Moro Bay, in Bradley County, where her husband embarked in the mercantile business. She testified that she kept the funds, at least her portion of them, with her in a trunk, and from time to time turned the same over to her husband to invest in his business and the purchase of lands. After stating that the funds turned over to her amounted to $4,451.60, she was asked, "Who handled and controlled this money, yourself or your husband?" to which she replied, "I had control of it when I wanted to, but I allowed my husband to invest it for me from time to time, but in each case, as far as I can recall, my husband consulted me with reference to each investment of my money." It does not appear that any property was purchased in her name, but what she meant by investment was that her husband used the money in his mercantile business and in buying property for himself. In other parts of her testimony she states that she lent the money to her husband and took his notes therefor. Her husband conducted the mercantile business at Moro Bay with his son for several years, and then moved to Hermitage, Arkansas, where the mercantile business was continued. She testified that she let him have about

$3,500 with which to buy property and build a store-house after they moved to Hermitage. About the time H. M. L. Carnley executed to his wife the deed in question, he transferred his bank stock and all of his interest in the stock of merchandise to his son, which completely denuded him of all property. The son testified that the reason his father transferred the property to him was that while his father managed the business at Moro Bay a heavy loss was sustained and the transfer was made to him to compensate for the loss.

Now, it appears from the above statement that Mrs. Carnley claims to have accumulated the sum of $4,451.60 in money, all of which accrued from the sale of her husband's lands, except the sum of $428.40 from the sale of the small tract which she owned; that her interest in the fund was asserted and recognized on account of the fact that she had by her own labor assisted her husband in acquiring the lands and that she should be compensated for that as well as her homestead interest; that she turned the money over to her husband in various sums from time to time and allowed him to use it in his business and in purchasing the property in controversy, and other property, the title to which was taken in his own name. In some parts of her testimony she stated that she turned the money over to him to invest for her; in other parts she stated that she loaned him the money and afterwards took his notes for some of it. She does not make a very satisfactory and convincing statement as to the particular times or dates when she turned the money over to him, nor the amounts, but in a general way she testified that he owed her the sum of $4,451.60 which she had turned over to him from time to time. It appears from her statement that she did not take her husband's notes for any of the money until about a year before the deed to her was executed, though she had been letting him have money for several years before that time.

In one place she says that she had his note for $2,000 and the note, dated July 20, 1908, is exhibited in the rec-

ord; in another place she says the note was for the sum of $2,500; and in still another place she says that there were two notes aggregating $2,500. She exhibited a note for $800, dated August 1, 1908. Upon the whole, her testimony is far from convincing that she turned the money over under any distinct obligation of her husband to repay it. It is evident from her own statement of the facts that, even if the money was turned over by her as she claimed, she permitted her husband to use it as his own and for his own purposes, and that he enjoyed a basis of credit on the faith of the property thus acquired. Under those circumstances she can not in a court of equity be permitted to reap the benefit to the detriment of a creditor who had been deceived by his false basis of credit.

In a somewhat similar case Judge RIDDICK, speaking for the court, said:

"It is no doubt just and right for a husband to return such funds, however stale the claim may be, if he can do so without infringing upon the rights of his creditors; but an insolvent debtor is not allowed to turn over his property to his wife, and let his creditors go unpaid, under the pretense of settling a shadowy claim for money of his wife which he received and spent many years before. As it would often be impossible for the creditor to dispute such ancient claims, to allow them to be set up in that way against the creditors would furnish an easy way for an insolvent debtor to shield his property from his creditors, while at the same time retaining all the essential benefits of the same to himself and family. For this reason when a wife allows her husband to use her money as his own for a long period of time, and thus to purchase property with it in his own name, and to obtain credit on the faith of his being the owner of it, she will not be allowed to claim such property as against his creditors." *Davis* v. *Yonge*, 74 Ark. 161.

Other cases announcing the same principle are: *Driggs* v. *Norwood*, 50 Ark. 42; *George Taylor Commission Co.* v. *Bell*, 62 Ark. 26; *Morris* v. *Fletcher*, 67 Ark.

105; *Roberts* v. *Bodman-Pettit Lumber Co.,* 84 Ark. 227; *Goodrich* v. *Bagnell Timber Co.,* 105 Ark. 90; *Haycock* v. *Tarver,* 107 Ark. 458. The doctrine of those cases applies with peculiar force in the present one, for the testimony shows that during the pendency of the case of *Browne* v. *Harry* appellant relied upon the solvency of H. M. L. Carnley as a surety on the bond. When the bond was executed appellant caused the record to be examined, and when he ascertained that he (Carnley) owned real estate and was in the mercantile business, and apparently being in prosperous circumstances, he accepted him as a bondsman and took no steps to have the bond renewed while the cause was pending for a period of something like five years. His attorneys, who lived in another county, relied upon appellant's examination of the record in determining that Carnley was solvent and constituted a good bondsman in the case.

Leaving out of the case entirely the suspicious circumstances that no written evidence of the alleged indebtedness of Carnley to his wife have been brought into the record, except the two notes executed about a year before the judgment was rendered and while the cause was pending, and also the further circumstance that the deed in controversy was not executed until a few days before the rendition of the judgment, we have the undisputed facts from the lips of Mrs. Carnley herself that she permitted her husband to use this money at will and, as before stated, she can not be permitted to take advantage of creditors who have been misled to their prejudice. The learned chancellor was, we think, in error in upholding the conveyance and in restraining appellant from enforcing his judgment. The decree is therefore reversed and the cause remanded with directions to dismiss the complaint of Mrs. Carnley for want of equity.